**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HEATHER NOEL NYE,**

> **Plaintiff,**

**v.**                                           **Case No.: 3:13-cv-12115**


**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

> **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14, 17).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

Plaintiff, Heather N. Nye ("Claimant"), filed the instant SSI and DIB applications on July 29, 2010, alleging a disability onset date of August 1, 2010.[1] (Tr. at 149-56). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 76, 81, 91, 94). Claimant filed a request for an administrative hearing, (Tr. at 97), which was held on December 19, 2011, before the Honorable Toby Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 31-71). By written decision dated December 8, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-21). Claimant filed a request for review by the Appeals Council and submitted new evidence in support of her claim, which was incorporated into the administrative record. (Tr. at 6-8). The ALJ's decision became the final decision of the Commissioner on March 29, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 2-5). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 10, 11), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 14, 17). Consequently, the matter is fully briefed and ready for resolution.

---

[1] Claimant subsequently amended her disability onset date to October 1, 2009, the date she ceased working. (Tr. at 38).

## II.    Claimant's Background

Claimant was 34 years old at the time she filed the instant applications for benefits and 36 years old at the time of the ALJ's decision. (Tr. at 21, 149). She completed four or more years of college and communicates in English. (Tr. at 49, 169). Her prior employment history includes work as a telemarketer, a church housekeeper, and a registered nurse. (Tr. at 40).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional

4

limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration[2]) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder,

---

[2] Section 12.00(C)(4) of the Listing defines episodes of decompensation of extended duration as follows:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

> The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence

the ALJ assesses the claimant's residual mental function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2011. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "obesity, fibromyalgia, degenerative disc disease, myofascial pain syndrome, and migraine headaches." (Tr. at 15-17, Finding No. 3). However, the ALJ determined that Claimant's history of narcotic abuse and allegations of PTSD and depression were nonsevere. (Tr. at 16-17). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except can occasionally climb, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold, extreme heat, noise, vibration, fumes, odors, gases, and poor ventilation; and must avoid even moderate exposure to hazards.

(Tr. at 18-20, Finding No. 5). Moving to the fourth step of the sequential evaluation process, the ALJ then determined that Claimant was able to perform past relevant work as a telemarketer, as this "does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. at 21, Finding No. 6). Therefore, the ALJ concluded that Claimant had not been under a disability from October 1, 2009 through the date of the decision and was not entitled to benefits. (*Id.*, Finding No. 7).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial evidence on the grounds that the ALJ (1) failed to develop the medical evidence regarding Claimant's impairments, (ECF No. 14 at 18-19); and (2) failed to properly evaluate the severity of Claimant's combination of impairments. (*Id.* at 19-21).

## V.   Relevant Medical History

### A. Treatment Records

#### 1. Mental Health Treatment

On April 7, 2010, Claimant began psychiatric treatment with Stephen Durrenberger, M.D., at Starlight Behavioral Health Services, who conducted a comprehensive psychiatric evaluation. (Tr. at 1013-20). Claimant reported a prior history of mental health treatment, which included a three-day admission to Mt. Caramel West Hospital in 2000 or 2001. (Tr. at 1015). However, Claimant stated that she had not seen a psychologist or psychiatrist in the past two years. (Tr. at 1013). She provided extensive history regarding her family, social, and romantic relationships, and reported a history of problems with prescribed narcotics, which resulted in two intensive treatment stints at Cleveland Clinic's pain management program in 1998 and

2005. (Tr. at 1013-15, 1017). Claimant's mental status examination reflected that the organization and form of her thoughts were mildly tangential, and she self-described her mood as "ambivalent." (Tr.at 1018). Her appearance, attitude, affect, speech, thought content, motor activity, cognitive function, memory, concentration, fund of knowledge, estimated intelligence level, insight, and judgment were all observed as within normal limits. (Tr. at 1019). Claimant was assessed with major depressive disorder, recurrent, moderate; PTSD, chronic, severe; OCD in remission; "rule out" Personality Disorder NOS,  "possible borderline and possible dependent traits;" with significant unresolved issues related to childhood abuse, financial problems, problems with primary support group, relationship problems, and employment problems. Claimant was assigned a Global Assessment of Functioning score of 53.[3] (*Id.*). Dr. Durrenberger adjusted Claimant's medication, and noted that Claimant "needs to seriously consider applying for disability due to all of her medical problems. She is not going to be able to sustain employment due to her physical problems, irrespective of her psychiatric issues." (*Id.*).

Ten days later, Claimant was admitted to St. Mary's Medical Center for an intentional drug overdose. (Tr. at 533). For the remainder of April and May 2010, Claimant met with Dr. Durrenberger on a weekly basis. During this time frame, Dr.

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at 16. Americ. Psych. Assoc, 32 (5th Ed. 2013)

A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

Durrenberger observed that Claimant's medications were "of limited benefit, but it isn't clear that she has any idea about what the medications are supposed to be doing for her, because her diagnoses are so nebulous and non-specific." (Tr. at 1011). Dr. Durrenberger felt Claimant had a "strong desire to work through some of the more traumatic events in her past," but her relationship with her parents, and current living situation under their roof, was going to be an obstacle "for her to gain any ground toward independence." (Tr. at 1012). Dr. Durrenberger further noted Claimant's medical problems were "not well explained by her diagnoses," and opined that there "may be a degree of factitious disorder, specifically munchausen's syndrome, for it appears that the only time [Claimant] has ever gained significant positive attention from her mother was when she was very ill." (*Id.*).

On May 14, 2010, Claimant appeared to have made some progress in terms of understanding herself and handling her family's dysfunction. (Tr. at 1006). Claimant reported better sleep and no episodes of amnesia, as well as improved energy/motivation. (*Id.*). Claimant's mood was observed as "improved" and "not as depressed, much more hopeful." (*Id.*). Dr. Durrenberger described Claimant's medication response as "improving" but commented that "much of the improvement, however, is due to her changing perspective." (*Id.*). Claimant's diagnoses remained unchanged; however, her GAF score was increased to 59. (Tr. at 1007). By May 25, 2010, Claimant's mental status examination was within normal limits, and Dr. Durrenberger opined that Claimant continued to improve and "show[ed] great potential and a strong likelihood that she will someday be able to establish independence again," with the only major obstacle being her physical health. (Tr. at 1004). Claimant was diagnosed with "major depressive disorder, recurrent, mild,"

PTSD, and "OCD in remission," as well as "Personality Disorder NOS, some borderline and dependent traits, but minimal," and was assigned a GAF score of 60. (Tr. at 1004-05).

Between June and August, Claimant met with Dr. Durrenberger approximately biweekly, throughout which she continued to show signs of improvement. (Tr. at 997-1003, 1741-44). Claimant's mental status examinations were consistently within normal limits, and Dr. Durrenberger regularly noted improvements in Claimant's outlook, behavior, and mental condition. (*Id.*). On July 1, 2010, Dr. Durrenberger noted that "it does not appear that depression is the cause of her latest problems, nor has it been fueled by the migraines." (Tr. at 1001). He assigned Claimant a GAF score of 62.[4] (*Id.*). On July 21, 2010, Dr. Durrenberger's assessment of Claimant changed to include "Mild depressive disorder, recurrent, mild to partial remission," PTSD, OCD in remission, and "PD NOS with some borderline and dependent traits (minimal)." (Tr. at 999-1000). On August 3, 2010, Dr. Durrenberger noted that Claimant had a "good response to medications" and was "not showing signs of depression like she had been." (Tr. at 997). On August 17, 2010, Claimant was "again moving forward," although she continued to struggle with managing relationship with her mother, father, and sister. (Tr. at 1743). On August 30, 2010, Claimant was noted to have suffered "a setback with her physical problems worsening," which caused her considerable distress. (Tr. at 1741). Her mental status examination reflected that her affect was "tearful at times but not labile and not particularly fragile," and that her "tears were appropriate and were

---

[4] A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

related more to the fact that she is scared because of her illness, frustrated that her future becomes more uncertain every time she is sick, and saddened by the fact that her mother is not able to give her unconditional support during her illness." (*Id.*). Otherwise, Claimant's sleep, energy, sensorium, appearance, mood, speech, thought processes, thought content, perception, behavior, and motor activity were all normal. (*Id.*).

On September 27, 2010, Claimant reported that "going 4 weeks without seeing [Dr. Durrenberger] ha[d] been bad for her." (Tr. at 1739). She reported difficulty with concentration and sleep, and a return of her OCD symptoms, including hearing distant voices and singing. (*Id.*). Claimant's mental status exam was largely normal, except for her report of auditory hallucinations, although she "admitted it could simply be noise from a humidifier or air purifier she is running in her room all the time." (Tr. at 1740). Claimant was assessed with "major depressive disorder, recurrent, mild," PTSD, OCD in remission, and "PD NOS with borderline and dependent traits," and assigned a GAF score of 61. (*Id.*).

Claimant met with Dr. Durrenberger twice in October 2010, during which she reported ongoing difficulties dealing with her family, and in particular her mother, although she continued to show improvement both with respect to perspective and coping mechanisms. (Tr. at 1735-38). Dr. Durrenberger documented that Claimant continued to struggle with her past, but was "showing progress subtly in several areas," including handling her family's dysfunction and maintaining healthy romantic relationships. (Tr. at 1738). He indicated that Claimant's response to medications was "actually fairly good." (Tr. at 1736).

On January 5, 2011, Dr. Durrenberger assessed Claimant with "major depressive disorder, recurrent, mild," PTSD, OCD in remission, and "PD NOS some borderline traits, though less evident, and some dependent traits, also less evident than one year ago," and assigned her a GAF score of 59. (Tr. at 2040). On January 14, 2010, Claimant's mental status exam was within normal limits, aside from insufficient sleep. (Tr. at 2038). On January 25, 2011, Dr. Durrenberger observed that Claimant was "actually still managing things fairly well" despite her family's dysfunction. (Tr. at 2036). On February 15, 2011, Claimant's mental status exam was essentially normal, except that her mood was observed as "not as cheerful but still okay," while her affect was "a bit dramatic with tears today." (Tr. at 2034).

Between March and November 2011, Claimant met with Dr. Durrenberger on a monthly to bimonthly basis, throughout which time she demonstrated continued improvement. (Tr. at 2010-33). Between March and April 2011, Claimant worked on her family and romantic relationships, while her mental status exams were largely within normal limits. (*Id.*). On April 18, 2011, Dr. Durrenberger observed that Claimant was "doing well" and was "much more stable emotionally and has moved past some of the issues that occurred recently that would have troubled her for months in the past." (Tr. at 2026).

In May and June 2011, Claimant continued to make progress emotionally, although she did suffer some difficulties relating to her physical condition. (Tr. at 2020-25). On June 28, 2011, Dr. Durrenberger noted that Claimant "continue[d] to be upset over the medical problems she is having" and observed that she had "regressed a bit again due to her physical health making her more dependent again," but opined that "the problems she is having right now are related to medical issues." (Tr. at 2020-

12

21).

Between July and September 2011, Claimant relayed family difficulties relating to her ailing grandmother, who ultimately passed away on September 25, 2011. (Tr. at 2014-19). Claimant's mood was observed as frustrated, either due to family conflict relating to her grandmother or to physical complications, but her mental status was otherwise within normal limits and she continued to do well and respond well to medication. (*Id*). On August 16, 2011, Dr. Durrenberger observed that Claimant was "still doing well" and that she was "not depressed, but is anxious trying to take care of her grandmother and pushing herself still, to do physical things that she shouldn't be doing." (Tr. at 2017). On August 30, 2011, Claimant's diagnoses remained the same, but Claimant was doing well, and her GAF score was increased to 64. (Tr. at 2015). On September 15, 2011, Claimant reported significantly increased physical problems, as well as ongoing conflict with her family, and her mood was observed as "frustrated again, over her medical issues and family problems." (Tr. at 2012). Dr. Durrenberger expressed concern over Claimant's medical problems and felt that they must take top priority. (Tr. at 2014).

In October and November 2011, Claimant's physical problems continued to be a source of mental difficulty and family conflict. (Tr. at 2010-11). On October 11, 2011, Claimant's mood was observed as "improved again, not depressed, not anxious" and Dr. Durrenberger noted that Claimant was "doing better." (Tr. at 2011). He also observed that Claimant "seems to be coping well with her family issues, too, standing up for herself, and not getting too involved in the family drama." (*Id.*). On November 8, 2011, Claimant reported experiencing two recent anxiety attacks, and her mood was observed to be "back down again, frustrated and more depressed again." (Tr. at 2010).

13

Dr. Durrenberger noted that her medical problems continued to be "difficult to understand and diagnose," and that "her family [was] unable to handle the illnesses she suffers, mainly because they seem to feel guilt and helplessness, so want her to fix herself, or simply to not act as though she is sick." (*Id.*). Claimant was assessed with "major depressive disorder, recurrent, mild," PTSD, OCD in remission, and "PD NOS some borderline traits, though less evident, and some dependent traits, also less evident than one year ago" and assigned a GAF score of 64. (*Id.*).

### 2. Pain Management

Between January 2009 and July 2011, Claimant received pain management treatment for her fibromyalgia at the Cabell Huntington Hospital Regional Pain Management Center. In January 2009, Claimant attended weekly appointments, in which she received a combination of nerve blocks, trigger point injections, and rhizotomy treatment. (Tr. at 922-28). In February and March 2009, Claimant received a biweekly combination of nerve block, rhizotomy, and trigger point injection therapies. (Tr. at 933-37, 942-45).

On March 3, 2009, progress notes indicate that "Right side T12 to L2 facet medial branch blocks" had "given her almost 100% pain relief," while "multiple trigger point injections" provided "good to excellent pain relief in the past, as well." (Tr. at 939). Physical examination revealed "some spasm in the paraspinal muscles and at the thoracolumbar junction," but was otherwise unremarkable. (Tr. at 940). Her treating physician, Dr. Memon, increased Claimant's prescriptions of Cymbalta and Talwin, scheduled additional trigger point injections, and ordered a physical therapist consultation regarding the possibility of a back lumbar brace. (Tr. at 940-41). Claimant also received a trigger point injection in April 2009, and a rhizotomy in May 2009. (Tr.

at 946-49).

On September 2, 2009, Claimant reported a fibromyalgia flare the week prior, accompanied by three falls. (Tr. at 951). Claimant reported that Talwin was not helping her pain, but that "Cymbalta does help with her fibromyalgia pain. It is the best she has ever been." (*Id.*). Claimant reported "100% pain relief for 6 weeks" after her pain treatment in May 2009. (*Id.*). On physical examination, Claimant was "very tender over the right lower dorsal facets" and reported "a little bit of tenderness over the left dorsal facets, but not like the right." (Tr. at 952). She had jump response on the right and trigger points in the paraspinal muscles in that area. (*Id.*). On September 3, 2009, Claimant underwent a rhizotomy, which she tolerated well. (Tr. at 955).

On October 5, 2009, progress notes reflect that Claimant's block treatment "ha[d] helped about 50% but the first few days the patient had increased pain and stiffness after the injection." (Tr. at 958). Physical examination of Claimant's back showed "diffuse scattered trigger points in the shoulder and the next area, otherwise unchanged." (Tr. at 959). Claimant received a trigger point injection, while Dr. Memon noted that "[o]n review of her medications it seems like she is being overmedicated with at least three sedatives and muscle relaxers including Trazodone, Zanaflex, and Ativan. (*Id.*). Dr. Memon recommended that Claimant decrease her Zanaflex and Ativan doses. (*Id.*).

In January and February 2010, Claimant attended bimonthly pain management appointments, in which she received a combination of nerve blocks, trigger point injections, and rhizotomy treatment. (Tr. at 961-66, 972-77). Progress notes dated February 4, 2010 indicate that Claimant's January 2010 blocks provided 100% pain relief, although they were starting to wear off. (Tr. at 968). Physical examination of

15

Claimant was unremarkable, except that she complained of neck pain. (Tr. at 969).

On April 20, 2010, Claimant complained of mid and low back pain, and reported falling the previous Friday. (Tr. at 978-81). Claimant reported experiencing about 50% pain relief from her most recent rhizotomy, while her physical examination was entirely unremarkable. (Tr. at 979-80). In a follow up note, co-treater, Dr. Ozturk, noted that Claimant reported that she had "been taking more medicine than prescribed," and that her mother had "taken her medicine and put it in a lock box." (Tr. at 980). Accordingly, he and Dr. Memon agreed to withhold any pain medicine for the next month, until after she was treated by her psychiatrist. (*Id.*).

Claimant received a trigger point injections on May 20 and June 24, 2010, and a nerve block on July 8, 2010. (Tr. at 984, 986-89). On July 15, 2010, Claimant reported that the nerve block provided inadequate pain relief which only lasted two hours. (Tr. at 991). Claimant was again observed as "very teary," while physical examination revealed "trigger points in the middle, lower thoracic, perivertebral muscles, otherwise, unchanged." (Tr. at 992). Claimant reported ongoing problems with headaches, for which Dr. Memon referred her to headache specialist, Dr. Foster. (*Id.*).      On September 7, 2010, Claimant complained of headaches and midthoracic/upper lumbar area pain. (Tr. at 1629). Dr. Memon scheduled a radiofrequency, but declined to give Claimant medication out of concern for abuse potential and the risk of rebound headaches in the long run. (*Id.*). Claimant underwent rhizotomy treatment on September 8 and September 23, 2010. (Tr. at 1631-36). On October 27, 2010, Claimant reported 75% pain relief from the most recent radiofrequency rhizotomy. (Tr. at 1638). Dr. Memon noted no significant changes in her lumbar x-ray results compared to those in 2009. (Tr. at 1639). He scheduled additional trigger point injections, and continued

her medications without change. (*Id.*).

On November 8, 2010, Claimant a received trigger point injection, (Tr. at 1641-42), but on November 22, 2010, she reported that it was not helping her. (Tr. at 1644). Claimant's physical examination was essentially normal. (Tr. at 1645). Claimant received additional rounds of trigger point injections on December 9, 2010, and January 10, 2011. (Tr. at 1648-50).

On July 28, 2011, Claimant received a round of medial branch blocks from Jimmy Adams, D.O. at Active Physical Medicine & Pain Center, pending approval for radiofrequency lesioning. (Tr. at 2171). Claimant reported a most recent series of branch blocks occurring on March 31, 2011, which provided several weeks of relief. *Id.*). Claimant's physical examination was essentially normal, except for "palpatory tenderness" in the lumbar paraspinal region. (Tr. at 2172). Claimant's back pain was "exacerbated with backward bending, [and] relieved with forward bending," which was "consistent with lumbar facet arthropathy causing mechanical low back pain." (*Id.*). Claimant left the procedure in good condition, and was instructed to follow-up in three to four weeks. (Tr. at 2173).

### 3. Primary Care and Emergency Room Treatment

Throughout the relevant time period, Claimant regularly sought urgent care and emergency room treatment for back pain, migraine headaches, and other acute conditions, in addition to attending less frequent primary care appointments at University Physicians & Surgeons.

Between August 2009 and September 2009, Claimant sought emergency room treatment for back pain on multiple occasions. August 26, 2009, Claimant complained of back pain after falling in the shower. (Tr. at 376). Claimant was assessed with a

lumbar contusion and chronic back pain. (Tr. at 377). On August 31, 2009, Claimant reported that she fell from her bed and hit her back three days prior. (Tr. at 381-98). Claimant complained of sharp pain in her lumbar spine, which was exacerbated by movement. (Tr. at 383). Claimant's lumbar midline showed tenderness, but no swelling, while the remainder of her physical examination was normal. (Tr. at 383-84). Claimant was diagnosed with a contusion of the back and discharged later that day. (Tr. at 384). On September 17, 2009, Claimant sought emergency treatment for chronic back pain. (Tr. at 399). X-ray results of Claimant's cervical spine revealed "no bone or joint abnormality," (Tr. at 402), while her dorsal spine x-ray revealed "no acute fracture of subluxation" although "early anterior osteophytic lipping [was] present within the lower thoracic spine." (Tr. at 403). On September 23, 2009, Claimant sought emergency treatment for bilateral flank pain and right hand pain due to falling in the shower earlier that day. (Tr. at 407). Claimant reported dysuria beginning two days prior and back and minimal back pain beginning a week prior, which was relieved by NSAIDS. (*Id.*). Physical examination revealed diffuse lower/lumbar tenderness and "mild tenderness of the right 3rd MCP joint." (Tr. at 408). Claimant was assessed with a urinary tract infection and right hand contusion secondary to falling. (Tr. at 409).

On October 15, 2009, Claimant was admitted to St. Mary's Medical Center for a drug overdose. (Tr. at 438-49). Treatment notes indicate that this was her third such overdose. (Tr. at 438). Claimant was confused, incoherent, and experiencing hallucinations. (*Id.*).

On November 15, 2009, Claimant sought emergency treatment for complaints of "body aches in back" with increased pain over her left scapula, and reported that her

left arm hurt to lift. (Tr. at 1761). Claimant was assessed with muscle spasm. (Tr. at 1762). On November 16, 2009, Claimant returned to the emergency room with complaints of a headache and abdominal pain with associated nausea and cramping. (Tr. at 453). She was assessed with abdominal pain and a migraine. (Tr. at 454).

On December 8, 2009, Claimant was admitted to the emergency room following a single-car accident. (Tr. at 463). X-rays of Claimant's knees and left shoulder revealed no acute fracture of dislocation. (Tr. at 470-72). CT scans of Claimant's dorsal spine, cervical spine, head, pelvis, and lumbar spine were all negative, while a CT scan of Claimant's abdomen reflected no traumatic abnormality. (Tr. at 473-75, 477-79). Claimant was assessed with a left shoulder contusion, bilateral knee contusions, cervical and lumbosacral strain, a closed head injury, and an abdominal contusion, and was discharged in stable condition. (Tr. at 464).

On December 10, 2009, Claimant was treated by her primary care physician, Ross Patton, M.D. at University Physicians & Surgeons for pain secondary to her car accident and a fall in the shower on December 9, 2009. (Tr. at 1036). Physical examination revealed tenderness on palpation of "the dorsal aspect of the middle finger PIP joint" and the dorsal aspect of both the third and fourth metacarpals of her right hand. (Tr. at 1037). Claimant's C4, C5, and C6 spinous processes were tender on palpation, as were her "paracervical muscles on both sides," although her "cervical spine showed no weakness." (*Id.*). There was tenderness and bruising over Claimant's left lateral posterior knee, as well as tenderness "over her hamstring distally" and the posterior aspect of her knee. (Tr. at 1038). Claimant was assessed with possible closed fractures of the shaft of the right third and right fourth metacarpals, closed fracture of the right middle finger PIP joint, sprained left hamstring insertion, and cervical

disorder. (*Id.*). On December 14, 2009, Claimant sought emergency treatment for injury to her left thigh/knee and right hand due to falling in the bathtub on December 9, 2009. (Tr. at 480-85). X-ray results of Claimant's left knee, left femur, and right hand were all negative. (Tr. at 483-85). Claimant was assessed with contusions on her left lower extremity and right hand, and prescribed Lortab. (Tr. at 481).

On January 5, 2010, Claimant underwent a MU Dexa Scan, which revealed that Claimant "has osteopenia or low bone mass," and that her "bone mineral density [was] below what is expected for her age." (Tr. at 628). Claimant was encouraged to increase her calcium and vitamin D intake, with recommendations that "the secondary causes of the bone loss should be evaluated," and that "pharmacological therapy for bone loss should be considered if clinically indicated." (*Id.*). On January 19, 2010, Claimant was treated by Dr. Patton with complaints of left knee pain and migraine headaches. (Tr. at 1034). On physical examination, Claimant's pes anserinus was tender on palpation, and she was assessed with anserine bursitis, for which she received an injection of methylprednisolone. (Tr. at 1035).

On February 11, 2010, Claimant sought emergency treatment for back pain, (Tr. at 486-514), which she described as chronic and moderate with exacerbating factors consisting of movement, bending over, and changing position. (Tr. at 495-96). Claimant's physical examination revealed tenderness in her neck and thoracic spine, however she had normal range of motion and normal strength. (Tr. at 491-92). Claimant was assessed with back pain and prescribed a Medrol Dosepak and Robaxin, with instructions to follow up with her primary care physician as needed. (Tr. at 492).

In March 2010, Claimant sought urgent care with complaints of migraines on three separate occasions. (Tr. at 1767-81). She was treated with pain medication and

instructed to go to the ER if her pain worsened. (*Id.*). Treatment notes dated March 19, 2010 indicate that Claimant initially claimed that Lortab was not helping, but she later reported that she had no medication and requested Demerol or Dilaudid. (Tr. at 1776).

On March 10, 2010, Claimant was treated at University Physicians & Surgeons for left shoulder pain. (Tr. at 1031-33). Physical exam revealed "tenderness on palpation of the shoulders" but they were otherwise normal as to appearance, motion, abduction, flexion, and external rotation, with no spasms, instability, or weakness. (Tr. at 1032). Claimant was prescribed Toradol. (Tr. at 1033). On March 15, 2010, Claimant attended a follow-up appointment for her left shoulder. (Tr. at 1028-30). On physical examination, there was "tenderness on palpation of the subacromial bursa" and pain was elicited on active external rotation, active cross-chest adduction, and passive external rotation. (Tr. at 1029). Claimant was assessed with subacromial bursitis, for which she received an injection of methylprednisolone. (*Id.*).

On March 22, 2010, Claimant sought emergency treatment for low back pain. (Tr. at 519-21). Claimant requested Demerol and Dilaudid, but was instead prescribed Lortab after "discuss[ing] necessity to maintain one pain management specialist." (Tr. at 520).

On March 24, 2010, Claimant returned to University Physicians and Surgeons for another shoulder injection, but was denied an injection due to having most recently received one on March 15, 2010. (Tr. at 1026). Also on March 24, 2010, Claimant was treated by Allan Chamberlain, M.D. with "complaints of pelvic pain and pain with intercourse." (Tr. at 1169). Based upon lab reports, Dr. Chamberlain "doubt[ed] rheumatologic basis for fatigue" and opined that it was "more likely fibromyalgia and effect of Trazodone." (*Id.*). Claimant was assessed with fibromyalgia, CPP, fatigue, and

low back pain. (Tr. at 1172).

On June 3, 2010, Claimant sought emergency treatment for left upper quadrant abdominal pain radiating into her back, beginning one week prior. (Tr. at 545). Claimant reported constant ache with intermittent episodes of sharp intense pain. (*Id.*). Claimant's physical examination was normal except for mild tenderness in her left flank, left upper quadrant, and left lower quadrant. (Tr. at 546). A CT scan of Claimant's abdomen revealed "no acute abnormality." (Tr. at 570). Claimant was diagnosed with abdominal pain and discharged in stable condition. (Tr. at 547-48). On June 10, 2010, Claimant attended a follow-up appointment with her primary care provider. (Tr. at 775-82). Her physical examination revealed abdominal tenderness in all four quadrants of the abdomen, but was otherwise normal. (Tr. at 779-80). She was assessed with abdominal pain, diarrhea, dysphagia, esophageal reflux, constipation, IBS, anemia, and gastric surgery gastrojejunosomy, and a series of lab tests were ordered. (Tr. at 781).

On June 21, 2010, Claimant was referred to Ralph Webb, M.D. due to multiple joint pains. (Tr. at 763-65). Claimant's physical examination was normal, and Dr. Webb assessed her with "diffuse musculoskeletal pain and trigger zones consistent with fibromyalgia," but noted that he "cannot appreciate any physical signs of an active connective tissue disease." (Tr. at 765). He further stated the he was "not sure why lupus is of concern," but that Claimant requested testing, which he ordered. (*Id.*).

In July 2010, Claimant sought urgent and emergency treatment for headaches on four separate occasions. (Tr. at 687-96, 866-69, 1782-91). On July 7, 2010, Claimant was diagnosed with sinusitis and a headache, and prescribed medication accordingly, although treatment notes indicate that "no narcs" were provided. (Tr. at

1783, 1786). On July 12, 2010, a CT scan of Claimant's head revealed "no abnormality of the brain or calvarium." (Tr. at 693). While Claimant was being treated for her headache, she began experiencing abdominal pain. (Tr. at 688). X-ray results of her abdomen revealed a nonspecific bowel gas pattern and "no abnormal calcification or pneumoperitoneum. (Tr. at 692). On July 14, 2010, Claimant underwent an outpatient esophagogastroduodenoscopy-EW, which also included biopsies of her small intestine and stomach. (Tr. at 710-49). Claimant's pathology report reflected that her GE junction and entire esophagus were normal, and her gastro-jejonostomy anastomosis appeared normal and patent without ulcers. (Tr. at 742-46). Her "gastric pouch showed some erythemas and poor contractions," and there was "mildly erythematous mucosa" found in her efferent jejunal loop. (Tr. at 742-43). Claimant's small intestine jejunum biopsy revealed "unremarkable small bowel mucosa" while her gastric biopsy revealed "mild chronic gastritis" although her Giemsa stain was negative for helicobacter pylori. (Tr. at 738).

Claimant continued to suffer periodic headaches between August and October 2010. On August 26, 2010, Claimant met with her primary care physician to discuss her ongoing headaches and for a general follow-up of chronic medical problems. (Tr. at 1022). Claimant was assessed with trochanteric bursitis, migraine headache, and primary nocturnal enuresis, with instructions to follow-up in four months. (Tr. at 1025). On August 31, 2010, Claimant was examined by Scott Gibbs, M.D., who had previously performed a subtotal thyroidectomy on her in 2008. (Tr. at 1958). Physical examination of Claimant was entirely within normal limits, and in his assessment Dr. Gibbs "strongly suspect[ed] that Ms. Nye is suffering from migraine headaches," and he did "not believe the sinusitis is the cause of her complaints." (*Id.*). Claimant

23

requested pain medication, which Dr. Gibbs declined to provide. (*Id.*). On September 21, 2010, Claimant was referred for examination regarding her ongoing headaches. (Tr. at 1335-41). The examining nurse practitioner described Claimant as "extremely histrionic," and Claimant's physical examination was essentially normal. (Tr. at 1340). Claimant was assessed with headaches and weakness/paresthesia. (*Id.*). A brain MRI and an EMG were ordered. (*Id.*).  On October 27, 2010, Claimant's brain MRI revealed no abnormalities, and there was no observed change compared to a prior study dated December 13, 1999. (Tr. at 1685-86).

In November 2010, Claimant sought repeated emergency care for chronic back pain, headaches and constipation. (Tr. at 1343-44, 1429-53, 1462-93). Treatment notes dated November 10, 2010 indicated that Claimant "is here frequently for headaches," while the examining physician assistant observed that Claimant "converses with [her] and does not act like she is in any severe pain." (Tr. at 1430). On both November 12 and November 16, 2010, Claimant's physical examination was essentially normal, except for some lumbar midline tenderness and lower back pain with range of motion. (Tr. at 1436, 1466).

On November 16, 2010, Claimant was admitted to the emergency room after being involved in a car accident. (Tr. at 1494-1500). X-ray results reviewed "no evident acute fracture or subluxation" of her cervical spine, dorsal (thoracic) spine, or lumbar spine although "mild degenerative disc changers" were observed in her thoracic spine. (Tr. at 1497-99). X-ray results of Claimant's mandible were also "unremarkable with no acute fracture identified." (Tr. at 1500). On November 23, 2010, Claimant sought emergency treatment for back and neck pain related to her car accident. (Tr. at 1501-34). CT scan results revealed "no evidence of cervical fracture or subluxation" and "no

24

evidence of lumbar spine fracture or subluxation." (Tr. at 1534). On November 28, 2010, Claimant was admitted to the emergency room after being involved in another car accident. (Tr. at 1536). X-ray results of Claimant's cervical spine, dorsal (thoracic) spine, and lumbar spine were all unchanged from her November 16, 2010 x-rays. (Tr. at 1540-42). CT scans of Claimant's abdomen and pelvis also revealed no acute findings. (Tr. at 1543-44). On December 2, 2010, Claimant attended a follow-up appointment with her primary care provider to receive a pain management referral for pain relating to her motor vehicle accidents. (Tr. at 1609-11).

Throughout December 2010, Claimant was treated repeatedly for left wrist pain. On December 9, 2010, Claimant was diagnosed with carpal tunnel syndrome and was prescribed pain medication and a left wrist hand splint, with instructions to follow up with a neurologist for an EMG. (Tr. at 1804-10). On December 19, 2010, a nerve conduction study was performed on Claimant's left upper and lower extremities, which resulted in a "minimally abnormal study." (Tr. at 1696-97). The examining neurologist opined that "[t]he finding of chronic motor unit action potential changes in the left abductor policis brevis [was] most likely attributable to the remote laceration on the thenar eminence, which most likely involved this muscle," but observed that there was "no other electrodiagnostic evidence of median mononeuropathy across the wrist." (Tr. at 1697). The neurologist further clarified that this "single finding of slightly prolonged ulnar mixed palmer latency compared to the median is of uncertain diagnostic significance." (*Id.*). On December 23, 2010, Claimant attended a follow-up appointment with her primary care provider regarding continued pain from her motor vehicle accident, as well as "new onset [of] swelling, primarily in the hands." (Tr. at 1615). Claimant was assessed with edema in her hands. (Tr. at 1617).

On January 18, 2011, Claimant began physical therapy for her wrist at the Sports Medicine and Rehabilitation Therapies (SMART) Center. (Tr. at 2148). Claimant attended physical therapy sessions for her wrist on January 18, 20, 25, 26, and February 1 and 15, 2011, throughout which she tolerated treatment well, and experienced some improvement in her carpal tunnel areas, but continued to experience pain and sensitivity. (Tr. at 2136-53). Claimant was also evaluated for lumbar and cervical pain on January 26 and February 1, 2011, respectively. (Tr. at 2127-34). Claimant attended physical therapy sessions for her lumbar and cervical pain on February 15 and 17, and March 8 and 11, of 2011. (Tr. at 2122-25). Claimant continued to experience pain and decreased range of motion, (Tr. at 2123-25), but as of March 11, 2011, Claimant reported "currently no cervical symptoms," although she was still experiencing lower back pain. (Tr. 2122). The physical therapist observed that Claimant had a good response to treatment with no increase in symptoms. (*Id.*). Subsequently, Claimant's physical therapist provided a letter to Dr. Patton stating that Claimant had not returned to the SMART Center since March 11, 2011, and was therefore considered self-discharged. (Tr. at 2121).

Between January and March 2011, Claimant was relatively healthy, although she did occasionally seek treatment for back pain. On January 28, 2011, Claimant sought emergency treatment for back pain. (Tr. at 2365-68). Claimant reported that she "comes to the ER and usually gets Dilaudid of Fentanyl for these rough patches," and requested "a shot to get through her son's school event." (Tr. at 2365). Claimant was observed as being "in no distress" and "doing craft project in the room," as well as moving with ease. (Tr. at 2366-68). Claimant was assessed with chronic and recurrent back pain, but she "left without completion of exam or instructions." (Tr. at 2368). On

February 26, 2011, Claimant sought urgent care for low back pain, and noted that she had missed physical therapy that week. (Tr. at 1834). She was prescribed Decadron for her pain. (Tr. at 1834). On March 17, 2011, Claimant's underwent a series of spine MRI's. (Tr. at 2104-09). Her cervical, thoracic, and lumbar spine MRI's all revealed "mild degenerative changes" but "no focal disc herniation or significant acquired spinal canal stenosis." (Tr. at 2105-09).

Between April and May 2011, Claimant complained of some sleep disturbance, but was otherwise relatively healthy. In April 2011, Claimant attended an appointment with her primary care provider, in which she reported daytime somnolence as well as fluid retention. (Tr. at 2111). Claimant's physical exam was essentially normal, and she was assessed with pitting edema, edema, reactive hypoglycemia, and possible sleep apnea, for which a sleep study was ordered. (Tr. at 2113-14). The sleep study was not conducted until June 6, 2011, but the results were "overall negative for any obstructive sleep apnea syndrome" although "significant sleep fragmentation was noticed." (Tr. at 1990). Accordingly, she was diagnosed with "sleep disturbance of unclear etiology" and "probable non-apneic nocturnal oxygen desaturations." (*Id.*). In May 2011, Claimant was treated for "left thyroid enlargement with dysphagia," (Tr. at 1954), and ultimately underwent a left thyroidectomy, (Tr. at 2303-04), which she tolerated well and without complication. (Tr. at 1951).

Throughout June 2011, Claimant experienced ongoing blood pressure difficulties, for which she sought both emergency and primary care treatment. On June 29, 2011, Claimant sought emergency care for hypotension. (Tr. at 2349). Aside from low blood pressure, Claimant's physical exam was essentially normal. (Tr. at 2351). She was discharged upon improved condition with instructions to follow up with a

cardiologist. (*Id.*). On July 5, 2011, Claimant underwent a tilt table test to diagnose presyncope episodes she had been experiencing. (Tr. at 2169). The test revealed that Claimant's "blood pressure pattern did not show significant correlation with symptoms." (*Id.*). When her blood pressure was low, she was asymptomatic and when her blood pressure was high she felt a little dizzy, but there were no arrhythmias during the study. (*Id.*). Accordingly, the examining physician concluded that Claimant had an "asymptomatic tilt table test" with "no arrhythmias" and "no chroniotropic incompetence." (*Id.*). Dr. Willis further noted "significant blood pressure decrease with vasomotor incompetence consistent with orthostatic hypotension not related to symptoms." (*Id.*).

On August 12, 2011, Claimant attended a primary care appointment with complaints of sleep disturbance. (Tr. at 1981-88). Claimant's physical examination was essentially normal. (Tr. at 1984-87). Claimant was assessed with insomnia and organic sleep-related hypoxia, and an overnight pulse oximetry was ordered with instructions to follow up in one month. (Tr. at 1987). The overnight oximitries test occurred on August 17, 2011, (Tr. at 1977-80), and revealed that Claimant "does NOT have significant Sleep Disordered Breathing as there are less than 5 desaturations per hour." (Tr. at 1979).

In September 2011, Claimant sought treatment on multiple occasions for shortness of breath, which later developed into pneumonia. (Tr. at 1947-48, 2166-68, 2344-48, 2427-29). On September 19, 2011, Claimant underwent an echocardiogram, which revealed that the "agitated saline study [was] suggestive of right to left shunt," that she had "normal left ventricular systolic function," and "mild to moderate tricuspid regurgitation. (Tr. at 1971). On September 30, 2011, Claimant was admitted

to the emergency department for community acquired pneumonia and edema, which was later determined to be secondary to her hypothyroidism. (Tr. at 2255). She was discharged the following day with instructions to follow up with her primary care provider. (Tr. at 2257).

Claimant continued to experience shortness of breath and other chest symptoms throughout October 2011. On October 5, 2011, Claimant underwent a methacholine challenge test for shortness of breath and possible asthma, but the test was negative. (Tr. at 1968). On October 14, 2011, Claimant underwent further testing, which resulted in an "EKG negative stress test for ischemia" with "no ST segment depression or ST segment elevation." (Tr. at 2158). She had normal functional capacity for her age and "appropriate hemodynamic response to exercise." (*Id.*). Claimant had "nonlimiting chest pain" during the exercise stress test and "occasional premature ventricular complexes." (*Id.*). On October 29, 2011, Claimant sought emergency treatment for "shortness of breath, muscle spasms, aches and swelling in hands and legs." (Tr. at 2330). Her physical examination was essentially normal, (Tr. at 2335-36), and she was assessed with anxiety disorder and hyperventilation with instructions to contact her primary care physician. (Tr. at 2337-38).

On December 16, 2011, Claimant sought emergency care for worsening shortness of breath and audible wheezing, with onset occurring three and a half weeks prior. (Tr. at 2322). Claimant's physical exam was normal, except that mild, expiratory wheezes were observed. (Tr. at 2325). Chest x-ray results revealed "no acute disease process," although Claimant "developed epigastric and right shoulder pain after Peak flow measurement." (*Id.*). Claimant was diagnosed with bronchitis and instructed to follow up with her primary care provider and to stop smoking. (Tr. at 2325). Claimant

returned to the emergency room the following day, after having slipped and fallen down steps headed to her car. (Tr. at 2327). She complained of "right shoulder pain, right hip/femur pain, and pain in the thoracic spine." (*Id.*). Claimant's physical exam was essentially normal, except for "mild tenderness without associated deformity of the right shoulder, right femur and right hip." (Tr. at 2329). Claimant's x-ray results revealed "no acute disease process," and she was observed as "ambulatory from ER without difficulty." (*Id.*).

On August 15, 2012, Claimant was admitted to the hospital with complaints of "headaches, hypotension, and dizzy spells with loss of consciousness." (Tr. at 2386). Claimant's physical exam was essentially normal, except for "moderate tenderness diffusely with guarding present" at her abdomen. (Tr. at 2391). Claimant's chest x-ray and head CT scan both "showed no acute changes." (Tr. at 2385). Claimant's "EKG showed sinus bradycardia with borderline old QT prolongation and new nonspecific T abnormalities," as well as "mild to moderate tricuspid regurgitation" with ejection fraction at 55% to 60%. (*Id.*). Her abdomen CT showed "wound dehiscence without abscess." (*Id.*). Claimant was diagnosed primarily with "recurrent syncope," with secondary diagnoses of hypotension, hypokalemia, hypomagnesemia, and wound dehiscence. (*Id.*).

On September 1, 2012, Claimant sought emergency treatment for low blood pressure, which was treated with IV fluids. (Tr. at 2202-11). There were also multiple changes made to her medication regimen. (Tr. at 2202).

On September 4, 2012, Claimant was admitted to the emergency department after being "found unresponsive and blue by her parents," which occurred after Claimant "had taken a fentanyl patch, cut it in half, and ate the jelly portion." (Tr. at

2179). Claimant required intubation, and a chest x-ray revealed that Claimant had "left lower lobe infiltrate." (Tr. at 2181). Claimant denied active suicidal ideations, but did admit to being depressed. (*Id.*). A follow-up x-ray on September 6, 2012 showed no infiltrate. (*Id.*). Claimant was diagnosed with "accidental ingestion of fentanyl patch content," "respiratory depression due to above, status post brief intubation and mechanical ventilator support," as well as chronic pain syndrome, opiate and benzodiazepine dependence, and history of fibromyalgia and history of hypotension. (Tr. at 2179).

On September 14, 2012, Claimant was admitted to St. Mary's Medical Center for emergency treatment of abdominal pain, constipation, and swelling. (Tr. at 2380). Her physical examination was essentially normal, but her pelvic CT revealed abnormal joint spaces, with "fluid filled short loop of small bowel." (Tr. at 2381). Claimant was assessed with abdominal pain and vomiting. (Tr. at 2382).  On September 16, 2012, an ultrasound of her abdomen "showed trace ascites," but was otherwise negative. (Tr. at 2371). Claimant's discharge summary indicates that during her hospital stay, she was "very dissatisfied with her care in terms of her pain management" and "continued to demand more doses of narcotics and was very manipulative with both the staff here as well as the initial medical team that was caring for her." (Tr. at 2373). The treating physician "could not find any evidence in her history of any medical condition that required her to be on narcotics of any [kind]," and referred Claimant to a pain management specialist who "elected to discontinue all narcotics of this patient," although he "did recommend she be transferred back to River Park for further care of her underlying psychiatric issues." (*Id.*). The pain specialist recommended a laxative regimen and advised Claimant "to avoid narcotics, as this is likely one of the

contributing factors to her chronic constipation." (*Id.*). Claimant was rapidly tapered off narcotics and benzodiazepines, and her treating physician repeatedly reiterated that Claimant should not be prescribed "any type of opiates in the future." (Tr. at 2373-79).

### B. Physical and Mental Evaluations and Opinions

#### 1. Physical Evaluations

On September 29, 2010, Uma Reddy, M.D., provided a physical RFC opinion of Claimant based upon her recent medical records. (Tr. at 1306-13). Dr. Reddy opined that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for a total of about 6 hours in an 8 hour workday, sit for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull. (Tr. at 1307). Dr. Reddy opined that Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl, (Tr. at 1308), and assigned no manipulative, visual, or communicative limitations. (Tr. at 1309-10). Regarding environmental limitations, Dr. Reddy opined that Claimant should avoid even moderate exposure to hazards such as machinery and heights; avoid concentrated exposure to extreme cold, extreme heat, noise, vibration, irritants such as fumes, odors, dusts, gases, and poor ventilation; and could withstand unlimited exposure to wetness and humidity. (Tr. at 1310). Dr. Reddy found Claimant to be "mostly credible with some supporting medical evidence in her folder, physical limitations expected but no listing limitations." (Tr. at 1311). Dr. Reddy noted that Claimant's activities of daily living indicate light work, and reduced her RFC accordingly. (*Id.*).

On November 1, 2010, Marcel Lambrechts, M.D. provided a case analysis in which he affirmed as written Dr. Reddy's RFC opinion. (Tr. at 1342).

On December 2, 2010, Claimant's treating physician, Ross Patton, M.D., provided a physical RFC opinion of Claimant, in which he opined that she could occasionally lift less than 10 pounds, stand and/or walk less than 2 hours, sit less than 2 hours in an 8 hour day, needed to alternate sitting and standing every hour, and had limited ability to push and/or pull in her upper extremities. (Tr. at 1546). Dr. Patton opined that Claimant could occasionally climb ramps and stairs, balance, and crawl, but that she could never climb ladders, ropes, or scaffolds, nor could she ever stoop, kneel, or crouch. (*Id.*). Dr. Patton did not assign any manipulative, communicative, or environmental limitations. (*Id.*).

On March 7, 2011 A. Rafael Gomez, M.D., provided a case analysis, in which he affirmed as written Dr. Reddy's physical RFC opinion. (Tr. at 1849).

### 2. Mental Evaluations

On September 27, 2010, Jeff Boggess, Ph.D., conducted a psychiatric review technique of Claimant based upon her mental health treatment records. (Tr. at 1292-1304). Dr. Boggess diagnosed Claimant with major depressive disorder, (Tr. at 1295), anxiety as evidenced by "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress," (Tr. at 1297), and a personality disorder NOS. (Tr. at 1299). However, he found these mental impairments to be nonsevere. (Tr. at 1292). Dr. Boggess opined that as a result of her mental impairments, Claimant was mildly limited in her activities of daily living and maintaining social functioning; had no difficulties maintaining concentration, persistence, or pace; and had experienced no episodes of decomposition. (Tr. at 1302). Accordingly, Dr. Boggess opined that Claimant did not satisfy any of the relevant Listing criteria. (Tr. at 1303). Dr. Boggess observed that "Claimant alleges multiple

problem areas on AFR, but self-reported ADL's and activities outlined on last treatment note do not suggest severe limitations in critical domains." (Tr. at 1304). Thus, Dr. Boggess regarded Claimant as "only partially credible with regard to allegations." (*Id.*).

On March 7, 2011, Jeff Harlow, Ph.D., conducted a psychiatric review technique of Claimant, based upon Claimant's mental health treatment records. (Tr. at 1835-48). Dr. Harlow assessed Claimant with depressive syndrome characterized by sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking, (Tr. at 1838), as well as anxiety as evidenced by "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress," (Tr. at 1840), and "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress" as evidenced by "pathological dependence, passivity, or aggressivity." (Tr. at 1842). However, he found these mental impairments to be nonsevere. (Tr. at 1835). Dr. Harlow opined that Claimant was mildly limited in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace; and that she had experienced no episodes of decompensation. (Tr. at 1845). Accordingly, Dr. Harlow opined that Claimant did not satisfy any of the relevant listing requirements. (Tr. at 1846). In his analysis, Dr. Harlow reiterated that Claimant's impairments of major depression, personality, and PTSD disorders were "not severe because all key functional capacities are indicated to be mildly deficient." (Tr. at 1847). He noted that Claimant's reports of limitations were "secondary to physical impairments," thus finding that her "comments about functional capacities are fully credible." (Tr. at 1847).

34

On April 7, 2011, Claimant's treating psychiatrist, Dr. Durrenberger, provided a mental RFC assessment of Claimant. (Tr. at 1939-40). Dr. Durrenberger opined that Claimant was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to accept instructions and respond appropriately to criticism from supervisors. (*Id.*). Otherwise, Dr. Durrenburger opined that Claimant was not significantly limited in any other functions relating to her understanding and memory, sustained concentration and persistence, social interaction, or adaptation. (*Id.*). However, Dr. Durrenberger stated that Claimant's "problems with respect to maintaining a regular schedule . . . have to do with physical disabilities not psychiatric." (Tr. at 1940). Dr. Durrenberger noted that Claimant "may have problems with criticism from supervisors. . .because she tends to want to please others and can be very hard on herself when she does not." (Tr. at 1940).

## VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a de novo review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. *Duty to Develop the Record*

Claimant first argues that the "ALJ failed to fully develop and consider [Claimant's] extensive complaints of injuries, pain, discomfort, and limitations." (ECF No. 4 at 18). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [her] multiple medical problems," the ALJ could not properly analyze her impairments as required by the regulations. (*Id.* at 19). Having reviewed the record in full, the undersigned finds this argument to be entirely without merit.

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that

result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Brown*, 44 F.3d at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000). In this case, Claimant fails to identify any evidentiary gaps in the record. Indeed, as the Commissioner emphasizes, the administrative record consists of over 2000 pages of detailed medical notes, spanning the course of nearly eight years. (ECF No. 17 at 12). Moreover, the ALJ obtained multiple physical and mental assessments from agency experts and heard testimony from both Claimant and her father. Accordingly, the record was extremely well-developed and certainly provided more than adequate information upon which the ALJ could properly evaluate Claimant's applications for benefits.

Notably, interspersed in Claimant's criticism regarding the development of the record is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians," in violation of applicable law. Specifically, Claimant asserts that the ALJ ignored treating physician Dr. Durrenberger's "findings of serious mental health issues regarding [Claimant's] major depression, PTSD, anxiety, and OCD." (ECF No. 14 at 18). Claimant appears to conflate the ALJ's duty to develop the record with the ALJ's separate responsibility to weigh medical source opinions in accordance with the

37

regulations. *See* 20 C.F.R. §§ 404.1527, 416.927. However, as discussed below, Claimant's allegation of error as to the weight accorded to the opinions of her treating providers is also unpersuasive.

### Weight Accorded to Medical Source Opinions

Medical source opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receives." *Id.* §§ 404.1527(b), 416.927(b).

When weighing medical source opinions, an ALJ should generally give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given controlling weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the claimant's case record. *Id.*; *see also* SSR 96-2p, 1996 WL 374188, at *2 (S.S.A. 1996) (explaining that "'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight."). When a treating physician's medical opinion is not afforded

controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6)[5] and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Brown,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).

Medical source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." SSR 96-5p, 1996 WL 374183, at *2. However, these opinions must still always be carefully considered, "must never be

---

[5] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*2-3. As explained in SSR 96-5p,

> The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner. If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

*Id.* at \*3. Although the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp. 2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, Case No. 2:08-cv—20-FL, 2009 WL 2135081, at \*4 (E.D.N.C. July 15, 2009).

Here, Claimant argues that the ALJ committed reversible error by ignoring Dr. Durrenberger's findings regarding Claimant's mental health issues. In particular, Claimant points out that Dr. Durrenberger diagnosed her with a GAF score "between 50-59 each time she was treated by him." (ECF No. 14 at 18). Claimant does not extrapolate on the significance of the scores, nor does she explain how the ALJ's decision demonstrates that these scores were ignored or discredited. Nonetheless, she contends that Dr. Durrenberger supplied credible opinions that were not properly weighed by the ALJ. However, the record clearly shows otherwise.

First, Claimant incorrectly asserts that "Dr. Durrenberger diagnosed Ms. Nye with a GAF between 50-59 each time she was treated by him." (*Id.*). Instead, the record reflects that Claimant was assigned GAF scores in the low 50's three times in April 2010, after which she was consistently assigned GAF scores ranging from 59-64. (Tr. at 997-1005, 1735-43, 2036-41). In fact, between August 30, 2011 and November 8, 2011, Claimant's GAF scores ranged from 62-64. (Tr. at 2010-16).

Second, this overall upward trajectory is consistent with Dr. Durrenberger's treatment notes, which reflect that between April 2010 and November 2011, Claimant demonstrated sustained improvement, both with respect to her response to medication, as well as the development of coping mechanisms and improved perspective relating to her family's dysfunction. Accordingly, Dr. Durrenberger's diagnoses of "major depressive disorder, recurrent, mild," PTSD, "OCD in remission" and "PD NOS some borderline traits, though less evident, and some dependent traits, also less evident than one year ago," (Tr. at 2010-41), are not inconsistent with the state-agency evaluators' opinions that Claimant's mental impairments were nonsevere. (Tr. 1292, 1835). Moreover, the ALJ explained in his written decision that he relied heavily upon Dr. Durrenberger's records in concluding that Claimant's mental impairments were nonsevere, referencing notations that Claimant had only mild symptoms, that she was stable and had improved with therapy and medication management. (Tr. at 16). Consequently, rather than ignoring Dr. Durrenberger's opinions, the ALJ generally gave considerable weight to his clinical findings and impressions.

Third, in his mental RFC opinion, Dr. Durrenberger opined that Claimant was not significantly limited with respect to any function other than her abilities "t0

perform activities within a schedule," "to complete a normal workday and workweek without interruptions from psychologically based symptoms" and "to accept instructions and respond appropriately to criticism." (Tr. at 1939-40). When explaining the basis for his opinions, Dr. Durrenberger stressed that Claimant's limited ability to maintain a regular schedule "ha[d] to do with physical disabilities not psychiatric," and that her impaired ability to respond to criticism was "because she tends to want to please others and can be very hard on herself when she does not." (Tr. at 1940). Therefore, Dr. Durrenberger's treatment notes and accompanying opinion regarding Claimant's functionality were largely compatiable with the ALJ's determination that Claimant was only mildly limited in her activities of daily living, social functioning, and concentration, persistence, or pace, and had experienced no episodes of extended decompensation. (Tr. at 17).

To the extent Claimant also seeks to argue that the ALJ incorrectly weighed opinions regarding her back pain and fibromyalgia, Claimant has failed to offer any treatment notes, diagnostic evidence, or argument in support of her claim. (ECF No. 14 at 18-19). Although Claimant's treating physician, Dr. Patton, did provide a physical RFC opinion, the ALJ discounted it as "inconsistent with Dr. Patton's own objective findings," (Tr. at 20), which included spine MRI results reflecting only "mild degenerative changes." (Tr. at 2104-09). Moreover, Dr. Patton's RFC opinion is void of any explanation or rationale to support the limitations he assigned to Claimant. (Tr. at 1540). In contrast, the ALJ provided a thorough evaluation of the medical evidence relating to Claimant's fibromyalgia and back pain, and explained that he gave great weight to the state agency physician's RFC opinion "because it is consistent with the overall objective evidence of record." (Tr. at 20). Agency consultants "are highly

qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. 1996). Opinions from agency consultants must be given weight when they are supported by evidence in the case record, and "[i]n appropriate circumstances. . . may be entitled to greater weight than the opinions of treating or examining sources." *Id.* Here the ALJ found the evidence to be supportive and consistent with the opinions of the agency experts and provided his rationale for that conclusion.

Accordingly, the undersigned **FINDS** that the ALJ did not err in failing to more fully develop the record; that the ALJ properly weighed the medical source opinions; and that the ALJ adequately explained the reasons for the weight he gave to those opinions, all in accordance with governing regulations.

### B. Combination of Impairments Equivalent to a Listing

Claimant next asserts that "the totality of [her] medical and mental problems, when combined, totally disable her and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 14 at 19). Claimant alternatively argues that she qualifies as disabled under Listing 12.04. (*Id.* at 20).

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found

disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *see also* 20 C.F.R. §§ 404.1526, 416.926. Under the applicable regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listed impairment, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria; (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment; or (3) if the claimant has a combination of impairments, no one of which meets a listed impairment, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings. If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar impairment. 20 C.F.R. §§ 404.1526(b),

44

416.926(b). However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

Contrary to Claimant's assertion, however, there is no "combination of impairments" listing. Instead, the Supreme Court has explained that "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments. . . irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532 (citing SSR 83-19).[6] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Commissioner of Social Security*, 529 F. App'x 706, 710 (6th Cir. 2013) (citing *Zebley*, 493 U.S. at 532). Thus, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. Accordingly, Claimant's assertion that "competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical and

---

[6] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zebly* remains relevant to this case.

mental impairments render her unable to function for 8 hours in any type of job," (ECF No. 14 at 19), is insufficient to establish that her combination of impairments is equivalent to a listed impairment that would warrant a finding of disability.

Furthermore, substantial evidence supports the ALJ's determination that Claimant's combination of impairments does not equal in severity any of the impairments in the Listing. Claimant does not contest the ALJ's determination that she failed to meet the listing requirements contained in Section 1.00 (musculoskeletal system), or Section 11.00 (neurological). (Tr. at 18). Instead, Claimant argues that substantial medical evidence establishes that she qualifies as disabled under Listing 12.04 (affective disorders). (ECF No. 14 at 20).

In order to meet or medically equal Listing 12.04, Claimant must first establish that she fulfills the criteria set forth in paragraph A of the disorder, often referred to as the diagnostic description. As explained in the Listing, "[t]he criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.04. Claimant contends that she meets paragraph A of Listing 12.04 given her evidence of sleep disturbance, difficulty concentrating, decreased energy, and thoughts of suicide. Indeed, paragraph A of Listing 12.04 is met by showing a persistent depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking.

Using these criteria, Claimant meets the diagnostic description of depressive disorder, and the ALJ acknowledged as much in his written decision. (Tr. at 16). However, the analysis does not end there. Claimant must also meet or equal the severity criteria contained in paragraph B or paragraph C of the listed impairment in order to be presumptively disabled. *Id.* ("The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A"). Under Listing 12.04, Claimant must also show that her depressive disorder:

B. [Resulted] in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

47

**OR**

C. [She had a m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.04. As the Commissioner points out, Claimant simply has no evidence to support the existence of paragraph B or C criteria. The ALJ found Claimant to have only mild limitations in activities of daily living, social functioning, and concentration, persistence, and pace. He found Claimant to have no episodes of decompensation. Claimant argues that Dr. Durrenberger opined that she had moderate problems with concentration and with maintaining a normal work schedule; however, Claimant fails to mention that Dr. Durrenberger associated these limitations with Claimant's *physical* impairments rather than her depression. Claimant also alleges that she had consistent GAF scores in the 50's and multiple suicide attempts, reflecting repeated episodes of decompensation. While Claimant did intentionally overdose on two occasions during the relevant time period, these do not qualify as "repeated episodes of decompensation, each of extended duration," as that phrase is defined by the SSA to mean "three episodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks." 20 C.F.R. § 404, Subpart P, App. 1,

Section 12.00(C)(4).

Therefore, after having thoroughly reviewed the evidence, the undersigned **FINDS** that the ALJ did not err in concluding that Claimant's impairments, individually and in combination, failed to meet or medically equal any of the impairments contained in the Listing.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 14), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 17), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court

of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 5, 2014

Cheryl A. Eifert
United States Magistrate Judge